

**SO ORDERED.**

**SIGNED this 12 day of November, 2009.**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.
PLEASE SEE DOCKET FOR ENTRY DATE.**

_____
R. Thomas Stinnett
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| In re: | No. 05-17687<br>Chapter 7 |
| JAMES LLOYD MARTIN, | |
|     Debtor. | |
| JERROLD D. FARINASH, Trustee, | |
|     Plaintiff, | |
| v. | Adv. Pro. No.<br>07-1054 |
| TUSCANY 2 RESIDENTIAL, LLC, | |
|     Defendant. | |

## MEMORANDUM AND ORDER

The debtor in bankruptcy, James Martin, was a commercial real estate developer involved with the Tuscany project in Evans, Weld County, Colorado. The debtor entered into two contracts to purchase land in the project area from Harry Wiedeman and a third contract to purchase land from Larry

and Martha Rhoadarmer. The debtor assigned all three contracts to the defendant, Tuscany 2 Residential, a limited liability company or LLC. The trustee in bankruptcy brought this suit to avoid the debtor's assignment of the second Wiedeman contract and the Rhoadarmer contract. The trustee contends the debtor made the assignments to secure a debt to Tuscany 2 Residential. The trustee has filed a motion for summary judgment. Tuscany 2 Residential has responded and filed a cross motion for summary judgment.

The facts in this adversary proceeding involve several limited liability companies (LLC's) whose names include "Tuscany" as the first word. The facts will be easier to read and maybe easier to understand if the court leaves "Tuscany" and LLC out of these names. The court may shorten the name even more. For example, the court refers to Tuscany 2 Residential, LLC, as 2 Residential or 2Res and to Tuscany 3 Residential as 3 Residential or 3Res. The court will refer to TLD Lender as Lender.

## SUMMARY JUDGMENT

A motion for summary judgment requires the court to view the evidence in the light most favorable to the party against whom judgment is being sought. The court can grant summary judgment only if it determines that there is no genuine issue as to any material fact, and based on the undisputed facts, the law entitles the moving party to judgment in its favor. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c); *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003). The moving party has the burden of proving there is no genuine issue of material fact to be decided by a trial.

## FACTS

### April 1999

The debtor entered into a contract with Mr. Wiedeman to buy real property located in Weld County, Colorado (the first Wiedeman contract). The contract called for a series of purchases of at least 30 acres each until all the land was purchased.

### July & August 1999

In July the debtor entered into the second Wiedeman contract to buy more land in the project area, and in August he entered into the Rhoadarmer contract for more land in the area.

### January 2003

The first Wiedeman contract was recorded in the property records of Weld County, Colorado.

### March–April 2003

In return for a loan, Parcel 2 executed a promissory note to Lender in the amount of $2,450,000. Lender was an LLC created by Litchfield Capital and Interim Capital, and perhaps the debtor. Its purpose was to lend money to a Tuscany entity for phase 2 of the Tuscany land development. Interim Capital was probably the loan servicer.

The note was secured by a deed of trust on real property in phase 2 of the Tuscany development. It was also secured by all the capital and profits of Parcel 2. Finally, the debtor and Parcel 2 assigned the first Wiedeman contract to Lender as additional collateral for the debt. The assignment identified the debtor as the manager of Parcel 2. A later release and assignment agreement identified the debtor as the sole member of Parcel 2.

The assignment provided that the debtor remained liable to the seller, Mr. Wiedeman, but the assignment gave Lender the power to fulfill the debtor's obligations and to take any other actions to preserve the contract. The assignment also gave Lender the authority to enforce the first Wiedeman contract in the place of the debtor. The assignment provided that it would be governed by the laws of Arizona except Arizona's conflicts of laws rules. The assignment was recorded in April 2003.

### September 2003

The debtor assigned his interest in the second Wiedeman contract and the Rhoadarmer contract to Land Holding LLC. The debtor was the organizer and sole member of Land Holding. The facts do not reveal whether these assignments were recorded in the real property records.

### March–April 2004

Lender and Parcel 2 entered into new contracts dealing with Parcel 2's secured debt to Lender under the promissory note for 2.45 million dollars. The key contracts were the release and assignment contract and the operating agreement for 2 Residential.

The release and assignment recited some background facts. It stated that: Lender had begun the foreclosure process in March 2004; Parcel 2's payments on the note were more than the principal and interest required to pay off the note; Parcel 2 owed other charges, such as attorney's fees, public trustee's fees, publication fees, advertising charges, and title insurance premiums; Parcel 2's debt for those charges – the remaining mortgage debt – was $290,065.03.

Parcel 2's debt to Lender was still secured by the mortgage on real property in phase 2 of the Tuscany development and by the debtor's assignment of the first Wiedeman contract. The release and assignment provided for Lender's release of the mortgage on the real estate and release of Parcel 2 from liability under the note, including the remaining mortgage debt. The release and assignment also provided that Lender would release the first Wiedeman contract.

Parcel 2 and Lender agreed to create 2 Residential to be the owner of the first Wiedeman contract. The deal included making the debtor, not Parcel 2, and Lender the joint owners or members of 2 Residential (2Res). Debtor became the Class A member. As part of this process, the parties did not make Lender a member of 2Res. Instead, 3 Residential (3Res) took the place of Lender and became the Class B member.

The bankruptcy trustee contends the debtor's assignment of the second Wiedeman contract and the Rhoadarmer contract to 2Res amounted to a transfer to secure a debt to 2Res or the Class B member. The true effect of the transaction depends first on the rights and obligations of the debtor and 3Res under the operating agreement for 2Res.

Again, the operating agreement for 2Res made the debtor the Class A member and 3Res the class B member. The initial capital contribution by 3Res was $290,065.63 – the remaining mortgage debt that Parcel 2 owed to Lender. The contracts released Parcel 2 from the debt and treated it as 3Res's

capital contribution to 2Res. The operating agreement required 3Res to make an additional capital contribution of $200,000 to be used by the debtor to plat the real property known as Tuscany Parcel 2.

The operating agreement provided that the debtor "shall" make several additional capital contributions. First, it required contribution of the money needed to complete the purchases under the first Wiedeman contract. If the debtor failed to make this contribution or provide timely proof of his ability to make it, then 3Res could "if desired" make the additional capital contribution. In that situation the operating agreement would count the contribution as an additional capital contribution by 3Res.

Second, the operating agreement required the debtor to make an additional capital contribution of the amount needed to buy out 3Res's interest in the LLC. The beginning point for calculating the amount needed to buy out another member in an LLC is the total of the other member's capital contributions.

The amount needed to buy out 3Res was identified as the redemption purchase price. It is explained in Section 3.9 of the operating agreement. Section 3.9 is titled "Additional Capital Contributions from Class B Member; Dividend Accrual for Class B Members Capital Contributions." 3Res was the Class B member.

Section 3.9 provided for cumulative preferred dividends of 15% per annum on initial capital contribution by the Class B member, the $290,065.63 remainder of the mortgage debt. All additional capital contributions by the Class B member were to be counted at $1.10 for each $1.00 contributed. This included the $200,000 contributed by 3Res for the debtor's use in platting part of the phase 2 property. If the Class B member made an additional capital contribution to complete a purchase under the first Wiedeman contract, that contribution would accrue cumulative preferred dividends of 20% per annum. Of course, the Class B member could make this additional capital contribution only if the debtor failed or was not able to make it.

Section 3.9 included a penalty dividend rate if the debtor failed to submit a plat of the Tuscany 2 property by September 1, 2004:

> If either the property known as "Tuscany 2 Residential" is not prepared and submitted to the City of Evans, Colorado by September 1, 2004 (meaning the preliminary plat is submitted to the City of Evans), then the dividend rate on all capital contributions (both initial and subsequent) shall be 20%.

Finally, Section 3.9 set the redemption purchase price as all of the above:

> (1) the unpaid mortgage debt that was the Class B member's initial capital contribution, plus a dividend of 15% per annum or 20% if Parcel 2 failed to meet the platting deadline;
>
> (2) if the Class B member contributed the money to complete purchases under the first Wiedeman contract, 110% of that amount plus a dividend of 20% per annum;
>
> (3) 110% of any other additional capital contributions, including the $200,000 contribution called for by the operating agreement, plus a dividend of 15% per annum or 20% if Parcel 2 failed to meet the platting deadline.

Section 7.11 of the operating agreement allowed the debtor to buy out Class B member by paying it the redemption purchase price. This section set a deadline:

> If 100% of the Class B Interests are not purchased from the Class B Members by January 1, 2006 or any Class A Member files bankruptcy or receivership within 90 days of such date, then the Class B Members shall have the right to purchase 100% of the Class A Interests for $1,000 . . . . In the event of any conflict, this Section 7.11 shall take priority over Exhibit B.

Exhibit B contains different terms as to buying out a member's interest.

The release and assignment explained that Lender and Parcel 2 wanted to convert Parcel 2's remaining debt to Lender into an equity interest for Lender in 2Res. Karl Huish was a principal in Litchfield Capital, the main lender in Lender. In his deposition, he said that the debtor was looking for additional capital to continue phase 2 of the Tuscany development, and Litchfield decided to go into business with the debtor – to create 2Res – after comparing the risk to the possible return. According to Mr. Huish, the debtor probably expected that he would find more capital to complete the series of purchases set out in the first Wiedeman contract. Litchfield did not have any particular expectation as to whether the debtor or Litchfield would contribute capital to carry out the first Wiedeman contract. Litchfield only knew that it might end up putting the money in.

The parties have raised the question of whether the debtor was personally liable for a debt to 2Res or the Class B member. The operating agreement for 2Res used imperative language – "shall" – with regard to the debtor's additional capital contributions. This language seemed to mean the debtor had a personal obligation to pay the redemption purchase price so that he could re-obtain the first Wiedeman contract and any land purchased under it. In other words, it seemed to mean the debtor owed a debt secured by the first Wiedeman contract as collateral. The contract may not have had that effect. Suppose the debtor failed to pay the redemption purchase price of the operating agreement. If the debtor did not redeem before the deadline, did he remain liable?

Section 3.3 of the operating agreement allows the manager, the Class B member, to notify a member of failure to make a required capital contribution. Section 3.4 provides that an interest holder cannot withdraw or otherwise reduce its capital contributions to the company, that an interest holder can look only to the company's property for return of its capital contributions, and that if the company's property after paying all its other obligations is not sufficient to repay all of an interest holder's capital contributions, then the interest holder cannot collect the deficit from the company, a member, or the manager except in the case of gross negligence, bad faith, or fraud. The agreement defined "interest holder" to include the two members. Section II, Paras. 2.1.14 & 2.1.15. Section 8.3 deals with winding up. 3Res might or might not wind up the company after buying out the debtor for $1,000. In any event, Section 8.3 provides that an interest holder, including a member, with a deficit balance in its capital account is not obligated to make up the deficit and does not owe a debt for the deficit.

Gerald Jorgensen did legal work for the Tuscany entities during phase 2 of the project. He testified in his deposition that he thought the operating agreement was not intended to make the debtor personally liable for a debt. He also gave a top-of-the-head opinion that the operating agreement amounted to a financing agreement with the first Wiedeman contract as collateral. As he said, he would give a real, considered opinion if paid to do so.

The operating agreement made Litchfield Capital and Interim Capital the managers of 2Res. The agreement effectively excluded the debtor from control over 2Res. Section 5.1 provided that

the debtor, as a member but not a manager, could not act for or bind the company. The remainder of Section V and other provisions of the operating agreement effectively excluded the debtor from management or control. Section VIII; Sections 7.1, 7.7, 9.7, 9.8, 10.1, 10.2 & 10.3. Of course, the debtor had voting rights as a member. The operating agreement in effect allowed the debtor to make capital contributions to recover the first Wiedeman contract and allowed him to use other, additional capital contributions by the Class B member that were for his use in the land development.

The operating agreement provided that it was governed by and should be interpreted under Arizona law. Section 10.5.

### September 2004

The parties amended the operating agreement. The amendment and the connected member and management agreement made Litchfield Capital the class B member and sole manager. Karl Huish of Litchfield explained that Litchfield would have been required to buy out Interim Capital's interest in 3Res to become full owner of the initial capital contribution, which was the remainder of Parcel 2's mortgage debt.

The amendment made some changes in the buyout section, Section 7.11. It changed the notice requirement for the Class B member to buy out the debtor for $1,000. The amendment also added an agreement that both members would use their best efforts to obtain a final plat for the Tuscany 2 property from the city at the earliest possible date.

The amendment added a new section 3.10 to the capital contributions section of the agreement. It provided:

> Two contracts representing options to purchase property known as "Tuscany 3," consisting . . . of approximately 234 acres of land, have been contributed/assigned to the LLC. These contracts shall be re-assigned to the Class A Members (or their designee) upon payment of $250,000 (and any payments pursuant to Section 4.1), which payment may be made through an escrow involving the sale of the Tuscany 3 property.

The options were the second Wiedeman contract and the Rhoadarmer contract. Section 4.1 deals with distributions of net cash flow. It was also revised by the amendment to add the language in italics:

> Distributions of Net Cash Flow. Except as otherwise provided in this Agreement, all distributions of Net Cash Flow shall be made to Interest Holders in the ratio of their Participation Percentages. Class B interests (including all amounts necessary to effect a complete purchase at the Redemption Purchase Price) shall be paid in full prior to any distribution on the Class A Interests. *In addition to any other distribution or participation herein, the Class B Interests shall receive an amount equal to five percent (5%) of the gross selling price on any sales of any property or option to purchase property which have been contributed to this LLC.*

This change was probably related to the debtor's contribution of the second Wiedeman contract and the Rhoadarmer contract. New section 3.10 recognized that the property covered by those contracts might be sold and the proceeds used to pay the $250,000 redemption price to 2Res.

The attached member and management agreement required Litchfield to make an additional capital contribution of $285,000. Litchfield also agreed to pay with regard to the Tuscany 2 property: (1) up to $10,000 to the city to finalize the Tuscany 2 plat; (2) up to $25,000 in deposits required by the city; (3) up to $25,000 in plat revision fees if needed to take account of a contract to sell part of the property. These payments were to be counted as additional capital contributions.

The amendment included a calculation of the redemption purchase price – the amount the debtor was required to pay to buy out Litchfield – as of September 1, 2004. It apparently does not include the additional capital contribution of $285,000 which was made several days later.

| | |
|---|---:|
| Carryover of funds from Tuscany 1 | 290,065.03 |
| Legal fees incurred | 12,129,72 |
| Appraisal and review fees | 7,500.00 |
| Contribution by Litchfield | 200,000.00 |
| Origination fee for $200,000 advance | 20,000.00 |
| Additional contribution by Litchfield | 100,000.00 |
| Origination fee for $100,000 advance | 10,000.00 |
| Legal fees incurred | 83.23 |
| Dividends accrued through 09/01/2004 | 38,017.32 |
| TOTAL | 677,795.30 |

The first Wiedeman contract that had been assigned to 2Res in the spring called for a series of purchases of 30 acres each. All the property was in phase 2 of the Tuscany development. 2Res

made the first purchase on September 7, 2004. It paid about $380,000 with capital contributed by Litchfield.

The debtor executed assignments of the second Wiedeman contract and the Rhoadarmer contract to 2Res, and the assignments were recorded on September 14, 2004. The assignments did not provide that Arizona law would apply. They did require recording in Colorado.

### March–April 2005

Of course, the debtor had previously assigned the second Wiedeman contract and the Rhoadarmer contract to Land Holding. Land Holding executed new assignments to 2Res. They were executed in March 2005, according to the notary stamp, and backdated to an effective date of September 1, 2004. The assignments were recorded in April 2005. They did not provide for Arizona law to apply.

### October 2005

The debtor filed a bankruptcy liquidation case on October 15, 2005.

### April 2007

2Res had previously made the first and second purchases of 30 acres each as called for by the first Wiedeman contract. In April 2007 it made the third purchase. Litchfield furnished all the capital.

### June 2007

Tuscany 2 had filed a lawsuit in Colorado against Wiedeman and the Rhoadarmers and Tuscany Parcel 3, LLLP. The land sellers claimed that they had terminated the contracts to sell to the debtor and sold the property to Tuscany Parcel 3. The court held that the sellers did not have the right to terminate the contracts to sell to the debtor, that the sale to Tuscany Parcel 3 was ineffective, and Tuscany 2 had the legal right to enforce the sale contracts to the debtor.

### DISCUSSION

The trustee is focusing on a continuing transaction that began in March and April 2004 with the creation of 2Res. The transaction continued into April 2005 with the recording of Land Holding's assignments to 2Res of the second Wiedeman contract and the Rhoadarmer contract. The trustee seeks to avoid only the assignments to 2Res of the second Wiedeman contract and the Rhoadarmer contract.

The trustee contends that the transaction amounted to secured lending: 2Res or the Class B member (Litchfield) lent money to the debtor secured by a lien on the debtor's property, the second Wiedeman contract and the Rhoadarmer contract.

The assignments were recorded more than six months before the debtor filed bankruptcy in October 2005. This fact calls into questions the trustee's ability to recover under bankruptcy code § 544. Section 544(a) generally allows a bankruptcy trustee to avoid a transfer by the debtor that was not perfected before bankruptcy. 11 U.S.C. § 544(a); *see, e.g.*, *Walker v. Elam (In re Fowler)*, 201 B.R. 771 (Bankr. E. D. Tenn. 1996); *Stubbins v. Wells Fargo Bank (In re Gibson)*, 395 B.R. 49 (Bankr. S. D. Ohio 2008).

The trustee's complaint alleged that it is not proper under Colorado law for a mortgage to be recorded in the name of the creditor-mortgagee as owner. This allegation treats 2Res as a creditor-mortgagee since the contracts were assigned to it. According to the trustee, 2Res has admitted that if the transaction was actually a mortgage, then its lien is not perfected under Colorado law and can be avoided under § 544. The court has found nothing to support this assertion by the trustee. In any event, it is of no consequence. The court disagrees with the trustee's argument. If the parties agree on the law during litigation, the agreement does not bind the court if their view of the law is wrong. *Bear River Paper & Bag Co. v. City of Petoskey*, 241 F. 53 (6th Cir. 1917).

Suppose that a judgment creditor acquires a lien on real property after a recorded transfer that was not structured or recorded as a mortgage. The judgment lien creditor proves the transfer was intended as a mortgage. The Supreme Court of Colorado has held that the judgment lien will not automatically gain priority over the disguised mortgage that was recorded as something else. The judgment creditor will not prevail simply because the recorded transfer did not identify the transaction as a mortgage or the transferee as a mortgagee. The recorded instrument still gives the judgment lien creditor effective notice of the transferee's interest in the property, whatever that interest might be. *McClure v. Smith*, 23 P. 786 (Colo. 1890); *Jefferson County Bank v. Hummel*, 53 P. 286 (Colo. Ct. App. 1898).

The trustee relies on a Colorado statute as for an opposite rule under Colorado law. The statute deals with the recording of a document that is forged, groundless, contains a false claim, contains a material misstatement, or is otherwise invalid. Colo. Rev. Stat. Ann. § 38-35-109(3). A transaction intended to create a mortgage may not be written up or recorded as a mortgage. That does not automatically make the transaction or the recorded documents invalid on any of the grounds set out in the statute or on any other ground. Furthermore, the statute in question allows the owner of the property to recover damages from someone who recorded an invalid document affecting the property. The statute can hardly apply when the owner agreed to the transaction and its recording, and the recorded documents do not misrepresent the terms, as opposed to the actual effect.

Of course, creditors of the owner may be able to avoid the transaction as a disguised mortgage if the disguise was intended as a fraud on them, but that is a different question. The structure of the transaction as something other than a mortgage and the accurate recording of the transaction do not automatically prove fraud. *McClure v. Smith*, 23 P. 786 (Colo. 1890).

In this regard, the Colorado Supreme Court pointed out that the recording of a disguised mortgage may not be effective against all creditors of the debtor if additional facts prove the transfer was made to defraud the debtor's creditors.

> But in our judgment the weight of authority favors the view heretofore announced by this court. It was held in Ross v. Duggan, 5 Colo. 85, that, while this method of creating an incumbrance is a conspicuous badge of fraud as to existing creditors, it is not conclusive, and that the bona fides of the transaction may be shown by collateral proofs. It is true that when the mortgagee consents to take an absolute deed, even though, as in the case at bar, he delivers back a defeasance, he makes it possible for the mortgagor to deceive his other creditors. For this reason, such a proceeding is regarded with disfavor, and upheld with reluctance. It would no doubt be wiser, as well as less harmful, if the mortgagee insisted upon having the transaction evidenced by an ordinary mortgage. But, if there be a bona fide debt for which the security is given; if there be no understanding with the mortgagee to hold the overplus, or to hold the property after payment of his debt, secretly, for the benefit of the mortgagor; if there be no collusion on the part of the mortgagee with the mortgagor in keeping the defeasance unrecorded, or in keeping secret the exact nature of the transaction, for the purpose of deceiving creditors; in short, if the mortgagee is simply endeavoring, in good faith, to obtain that precedence in the security of his debt which the law permits, the mere isolated fact that he takes an absolute deed, instead of a mortgage, will not, in and of itself alone, render his lien nugatory. The law prescribes no absolute and inflexible form

> for mortgages upon realty. It certainly assumes that such instruments as the one under consideration will sometimes be employed. Section 261, Civil Code 1887, provides that 'the fact of a deed being a mortgage, in effect, may be proved by oral testimony.' While this section would not be permitted to affect the title of a bona fide purchaser from the mortgagee, for good consideration, without notice, we conceive it to be broad enough to permit the proof mentioned as between the parties, and as against the claims of other creditors. The view that fraud per se should not be imputed to such transactions as the one under consideration receives countenance from section 1529 of the General Statutes. This section declares that the question of fraudulent intent, in all cases relating to the conveyance or assignment of any estate or interest in lands, shall be a question of fact, and not of law.

*McClure v. Smith*, 23 P. 786, 787–788. Colorado law still provides that the question of fraudulent intent is a question of fact, not law. Colo. Rev. Stat. Ann. § 38-10-120.

The Colorado Supreme Court mentioned only creditors at the time of the recording. The trustee has relied on § 544(b), which allows him to assert the rights under state law of an actual creditor that was still a creditor at the time of the debtor's bankruptcy. The trustee has not, however, identified any such creditor. 11 U.S.C. § 544(b). Since the trustee has not identified a specific creditor, he cannot rely on the Colorado statutes dealing with either actual or constructive fraud. *Giacometti v. Arton Bermuda Ltd. (In re Sia)*, 349 B.R. 640 (Bankr. D. Hawaii 2006); *Tomsic v. Pitocchelli (In re Tri-Star Technologies Co.)*, 260 B.R. 319 (Bankr. D. Mass. 2001).

Nevertheless, the court will take up the question of actual fraud since it can prevent the recording from being effective against creditors and 2Res has also moved for summary judgment on the trustee's claim that the assignments were made with actual intent to hinder, delay, or defraud the debtor's creditors. 11 U.S.C. § 548(a)(1)(A).

A financing transaction may be disguised as something else with the intent to hinder, delay, or defraud the borrower's other creditors. The court concludes that the creation of 2Res was not a disguised financing transaction. The court agrees with the explanation by Mr. Huish of Litchfield Capital. The lenders decided not to lend any more money to the debtor or his LLC's. But the risk-return calculation justified investing in the Tuscany project along with the debtor. Their investment venture, 2Res, allowed the lenders to acquire an interest in an option to buy some of the land (the first Wiedeman contract), and

it created the possibility that 2Res might buy some of the land and eventually own it entirely for the lenders' benefit to the exclusion of the debtor.

Other facts agree with the conclusion that 2Res was an investment vehicle instead of a collateral holder in a disguised financing transaction. The lenders provided the debtor additional capital for the Tuscany development. The operating agreement gave the debtor almost two years to buy out the lender's interest and re-acquire the first Wiedeman contract or any land purchased under it. The debtor obviously intended the transaction to give him a chance to continue his investment in the Tuscany development. The lenders took the risk of becoming investors in the development if the debtor did not buy them out.

The trustee's complaint does not cite the bankruptcy statute allowing him to avoid a transfer on the ground of constructive fraud. 11 U.S.C. § 548(a)(1)(B). It is referred to in a brief. Docket No. 31. In this situation, the court will not discuss or rule on possible avoidance on the ground of constructive fraud under § 548(a)(1)(B). As already mentioned, the trustee cannot avoid the assignments on the ground of constructive fraud under Colorado law. At this point, the court is concerned with a related actual fraud argument that the first Wiedeman contract was worth much more than the benefits received by the debtor as a member of 2Res. The undisputed facts do not show that the contract was worth much more or any other ground for finding constructive fraud.

In summary, the undisputed facts do not show that the debtor or the lenders were taking an asset, the first Wiedeman contract, that had substantial equity for the debtor's creditors so that they could unfairly obtain all the equity for themselves. The investment venture may have been riskier for the debtor and a good deal for the lenders, but the debtor benefitted from it. In this regard, the court cannot overlook the benefit of preserving the first Wiedeman contract over a period of time when purchases were needed but the debtor may not have been able to obtain other financing.

Of course, the court rejects the trustee's argument that the transaction was fraudulent solely because it was intended to circumvent the Colorado foreclosure statutes.

The trustee argues other facts as evidence of actual fraud, but those facts are unconvincing. Land Holding re-assigned the second Wiedeman contract and the Rhoadarmer contract in the spring of 2005 after the debtor attempted to assign them in September 2004. The re-assignment does not suggest fraud. The earlier assignments were recorded in September 2004. The debtor simply corrected a mistake. The court understands that the debtor may have lost his memory of the assignment to Land Holding. The development project resulted in a forest of Tuscany-named LLC's that existed to deal with particular transactions.

In summary, the creation of 2Res, including assignment of the first Wiedeman contract, did not involve the intent to hinder, delay, or defraud the debtor's existing or future creditors. This is true even if the creation of 2Res and its operating agreement amounted to a disguised agreement for secured financing. Even if that were true, the absence of actual fraud on the debtor's creditors means that the recorded assignment gave effective notice to the debtor's creditors of 2Res's interest, whatever it was, including the interest of the Class B member.

The next question is whether the court should reach a different conclusion for the debtor's assignment of the second Wiedeman contract and the Rhoadarmer contract. Again, disguised financing can be a method of defrauding the borrower-debtor's creditors, and if so, the recording of the transaction may not be effective against his creditors.

The debtor received another $285,000 from Litchfield at the time of these assignments and Litchfield's promise to pay other development expenses. The debtor could get the two contracts back by paying Litchfield a smaller amount, $250,000. The assignments were connected to the $285,000 contribution and the agreement to pay development expenses. The operating agreement does not expressly put a time limit on payment of the $250,000. The undisputed facts do not show that the assigned contracts were worth much more than $250,000 or $285,000. In summary, the undisputed facts do not show that the debtor or Litchfield had the intent to preserve the assigned contracts for their own profit when the contracts had significant equity for the debtor's other creditors over and above the benefits the debtor received in return for the assignments. The undisputed facts show the opposite.

Since the assignments involved no actual fraud on the debtor's creditors, their recording in April 2005 gave legally effective notice of 2Res's rights to all parties who might assert an interest in the contracts, including the trustee. Again, it makes no difference if the assignments were absolute transfers or transfers to secure a debt. The assignments were perfected in April 2005 against the trustee's rights under § 544(a). The trustee cannot avoid the assignments under that provision.

The court's reasoning also means that the trustee cannot avoid the assignments on the ground that the assignments were made with the actual intent to hinder, delay, or defraud creditors.

The trustee contends the assignments were preferential transfers. For the purpose of this argument, the court assumes that 2Res or Litchfield as the Class B member was a creditor of the debtor.

Since the assignments were effectively recorded in April 2005, the transfers occurred no later than then. 11 U.S.C. § 547(e). The transfers occurred more than 90 days before the date of the debtor's bankruptcy. The result is that the trustee can avoid the assignments only if 2Res was an insider of the debtor. 11 U.S.C. § 547(b)(4)(A). The preference period for transfers to insiders is one year before the date of filing bankruptcy. 11 U.S.C. § 547(b)(4)(B). The question is whether 2Res is an insider of the debtor as a member of 2Res.

The definition of entities who are insiders of an individual debtor does not expressly include an LLC in which the debtor is a member. But, the court can find guidance in the rules as to corporations. 11 U.S.C. §§ 101(9), (31); *O'Connell v. Shallo (In re Die Fliedermaus, LLC)*, 323 B.R. 101 (Bankr. S. D. N. Y. 2005); *Smith v. Porter (In re Carr & Porter, LLC)*, 2009 WL 903258 (Bankr. E. D. Va. Mar. 17, 2009). The cited cases involved debtors who were LLC's, not individuals. With regard to corporations, however, the definition of corporate insiders of an individual debtor mirrors the definition of individual insiders of a corporate debtor. 11 U.S.C. §§ 101(31)(A)(iv) & (B)(i)–(iii).

For an individual debtor, insiders include a corporation of which the debtor is a director, officer, or person in control. 11 U.S.C. §§ 101(31)(A)(iv). The debtor certainly was not a director, officer, or person in control of 2Res.

This definition is not exclusive. A corporation may be an insider of an individual debtor who is not a director, officer, or person in control of the corporation. The concept of an insider is aimed at making the avoidable preference period longer for creditors with unusual influence over the debtor and other creditors the debtor might especially want to prefer for personal or business reasons. *Die Fliedermaus, LLC)*, 323 B.R. 101; *Carr & Porter, LLC*, 2009 WL 903258. The court's earlier reasoning as to actual fraud applies here. Furthermore, the debtor and Litchfield were involved in 2Res as an investment vehicle for their mutual benefit. Assignment of the contracts occurred in their ongoing relationship. It involved another capital contribution by Litchfield for the debtor's benefit and other agreements for his benefit. The assignments may not have been routine, but they were not exceptional. In summary, the undisputed facts do not show that the debtor had any reason for treating 2Res specially compared to his other creditors. The court concludes that 2Res and Litchfield were not insiders of the debtor. The result is that the assignments cannot be avoided as preferential transfers.

The parties have used a lot of pixels arguing whether 2Res or Litchfield was a creditor. The trustee has correctly pointed out that the debtor could have owed a non-recourse debt to 2Res or Litchfield – if his property was collateral for a debt but he was not personally liable. The court has concluded that the creation of 2Res and assignment of the first Wiedeman contract was not a secured loan to the debtor. In light of the court's reasoning up to this point, it might treat this issue as irrelevant, but for the sake of completeness, the court will address it.

The court's reasoning as to assignment of the first Wiedeman contract may not apply to the two assignments in question. They differed in one significant way. The amended operating agreement identified the assigned contracts as being contributions to 2Res, meaning capital contributions. Normally the debtor could not withdraw the contracts since they were capital contributions. Operating Agreement Section III. The debtor could obtain sole ownership by becoming the sole owner and manager of 2Res – by buying out Litchfield. The amended operating agreement, however, allowed the debtor to buy back the contracts for a payment of $250,000. This apparently took the two contracts outside the usual rule

for capital contributions. Amended Operating Agreement § 3.10; Member and Manager Agreement Paragraphs 5 & 7 (Exh. F was apparently the amended operating agreement).

The different buy-back arrangement makes the transaction look like an assignment of the contracts to secure a debt of $250,000. But, the basis of a debt for $250,000 is not clear at all. Litchfield contributed $285,000 for the debtor's use as to Tuscany phase 2 and promised to pay other expenses for Tuscany phase 2. The purpose of the assignments and the separate buy-back agreement is unclear. The parties appear to have been thinking that the debtor could contribute $250,000 in capital from a sale of the assigned contracts or property subject to the contracts, and if he obtained more, then it would be his to invest in 2Res or not – except for a 5% payment to Litchfield. Amended Operating Agreement Para. 4.1. On the other hand, if the property was not sold and the debtor did not redeem the contracts for $250,000, then the contracts would remain in 2Res as a capital contributions. In this view of the facts, the assignments were ordinary investments in 2Res and not transfers to secure a debt for $250,000. The undisputed facts do not lead the court to conclude that the assignment of the contracts was made to secure a debt.

Even if the assignments were made to secure a debt, the trustee cannot avoid the assignments. On this point, the following is a summary of the court's reasoning up to this point. The lack of any actual fraud in the transaction makes their recording effective against the trustee no later than April 2005. The timing prevents the trustee from avoiding the assignments as preferential transfers. The effective recording prevents the trustee from avoiding the transfers under § 544(a). The trustee also cannot avoid the assignments on the ground of actual fraud under § 548(a)(1)(A) of the bankruptcy code. Finally, the trustee cannot avoid the assignments on the basis of actual or constructive fraud under Colorado law because he has not identified an actual creditor who could do so.

The trustee's complaint asked the court to re-characterize the transaction as a pledge of the contracts to secure a debt. In light of the court's preceding decisions, that request must also be denied. The trustee did not seek summary judgment on count 6 of the complaint; it alleges that continuing the Colorado litigation involving the assigned contracts will violate the automatic stay. 11 U.S.C. §

362(a)(3), (6). 2Res moved for summary judgment on all counts. In light of the court's reasoning, 2Res is entitled to summary judgment.

2Res argued that court should apply Arizona law to decide whether the assignments in question were part of an investment venture with the lenders or were made to secure the debtor's debts for loans from 2Res or the lenders. The court doubts that Arizona law should apply to an assignment that creates an equitable interest in real property in Colorado. *Davis v. Pursel*, 134 P. 107 (Colo. 1913); *Austin v. Stephen*, 300 P. 364 (Colo. 1931); Colo. Rev. Stat. Ann. § 38-35-109. The court has found no critical difference between the law of Colorado and the law of Arizona. Indeed, Colorado law may be slightly more favorable to 2Res than Arizona law. Under the law of either state, the legal character of the transaction depends on the intent of the parties, especially in light of the transaction's practical effect. As to Arizona law, *see Bostwick v, Jasin*, 821 P.2d 282 (Ariz. Ct. App. 1991) (joint venture); *DeWulf v. Bissell*, 316 P.2d 492 (Ariz. 1957); *Britz v. Kinsvater*, 351 P.2d 986 (Ariz. 1960); *Merryweather v. Pendleton*, 367 P.2d 251 (Ariz. 1962) (personal property); *Downs v. Ziegler*, 477 P.2d 261 (Ariz. Ct. App. 1970). As to Colorado law, see *Butsch v. Smith*, 90 P. 61 (Colo. 1907) (value of transferred property compared to benefit to grantor); *Perot v. Cooper*, 28 P. 391 (Colo. 1891) (standard of proof); *Baird v. Baird*, 111 P. 79 (Colo. 1910) (intent of parties); *Taylor v. Briggs*, 60 P.2d 1081 (Colo. 1936) (spirit of the transaction); *Pullara v. Hed*, 215 P.2d 321 (Colo. 1950) (joint venture not mortgage).

## CONCLUSION

The court will enter summary judgment for the defendant on all counts of the complaint. Judgment on the pleadings might be more appropriate for the trustee's claim under § 544(b) of the bankruptcy code, but summary judgment will serve the same purpose. Fed. R. Bankr. P. 7012(b); Fed. R. Civ. P. 12(c).

# # #